**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE | : | |
| COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:06-CV-1801-RWS |
| | : | |
| ARCHIE PAUL REYNOLDS, | : | |
| a/k/a Dr. A. Paul Reynolds, *et al.,* | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

This case is before the Court for consideration of Plaintiff's Motion for Summary Judgment Against Defendant Archie Paul Reynolds and Success Trust & Holding, LLC [74]. Defendants have filed no response to the Motion, and it is deemed to be unopposed. L.R. 7.1B, N.D. Ga.

### <u>Factual Background</u>

On August 2, 2006, Plaintiff Securities and Exchange Commission (the "Commission") filed a Complaint seeking a permanent injunction, disgorgement, and civil penalties against Defendants Archie Paul Reynolds ("Reynolds") and Success Trust & Holding, LLC ("Success Trust"). Defendants filed an Answer [13] in which Reynolds asserted his Fifth

Amendment privilege against compelled self-incrimination in response to the substantive allegations of the Complaint.  On July 19, 2006, Reynolds provided testimony to the Commission in which he asserted his Fifth Amendment privilege against compelled self-incrimination. (Memo in Support of Pl.'s Emergency Application [2], Ex. 5.)

From as early as May 2005 through June 2006, Reynolds, acting through Success Trust, raised millions of dollars from at least 500 investors by offering and selling fraudulent interests in three (3) investment programs.  The facts show that Defendants made numerous false and misleading statements to investors, including: (1) false statements that investor funds and/or investor real estate equity would be used in profitable, risk-free transactions (Undisputed Facts ¶ 9); (2) false claims that Success Trust had relationships with the "top global consortium group of the world" and the "top 15 Financial partners of the world" (Id. ¶ 13); (3) false representations that investors would receive bank guarantees or other instruments to protect their real property (id. ¶ 23); and (4) numerous misrepresentations intended to deceive investors and potential investors into believing that the Success Trust programs had received regulatory approval. (Id. ¶ 40.) Defendants also failed to disclose several material facts to investors, including: (1) that investor funds were used to pay commissions to

2

Independent Representatives; and (2) that funds from the Programs would be commingled and used to pay Reynolds' personal expenses. (Id. ¶¶ 42-58.)

After reviewing materials describing the Programs, Professor James Byrne, an expert in banking law and commercial fraud, opined that none of the Programs reflected legitimate transactions. (See Declaration of Professor James E. Byrne Regarding Success Trust & Holding LLC and Dr. A. Paul Reynolds, July 26, 2006, ¶¶ 14 &15 [hereinafter "Byrne Dec. ¶ ___"], attached as Ex. 3 to TRO Mem. (Dkt. No. 2).) Professor Byrne observed that the Programs share numerous characteristics with "Prime Bank" investment schemes. (Id. ¶ 15.) "Prime Bank" schemes are international financial scams in which the promoter represents that the offerings are "supported by or involve 'prime' or major banks." (Id. ¶ 18.) One example of the way in which the Success Trust Programs resemble a "Prime Bank" investment scheme is Reynolds' claim that the Programs are conducted with the world's largest banks and major world financial institutions and that the programs are regulated. (Id. ¶ 23a.) These types of false statements are commonly used in "Prime Bank" schemes. (Id.) Additionally, Success Trust's Programs offered extraordinary yield at no risk to investors; such representations are common to "Prime Bank" schemes, but cannot be assured in the real world. (Id. ¶¶ 23b & 23c.)

AO 72A
(Rev.8/82)

**Discussion**

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome

4

of the suit under the governing law.  Id.  An issue is genuine when the evidence

is such that a reasonable jury could return a verdict for the non-moving party.

Id. at 249-50.

In resolving a motion for summary judgment, the court must view all

evidence and draw all reasonable inferences in the light most favorable to the

non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th

Cir. 2002).  But, the court is bound only to draw those inferences which are

reasonable.  "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no genuine issue for trial."

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.

Ct. 1348, 89 L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted."  Anderson,

477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at

586 (once the moving party has met its burden under Rule 56(c), the

nonmoving party "must do more than simply show there is some metaphysical

doubt as to the material facts").

Section 2(a)(1) of the Securities Act of 1933 ("Securities Act") and

Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act")

5

define a "security" to include an "investment contract."   The Supreme Court in

SEC v. W. J. Howey Co., 328 U.S. 293, 298-99 (1946), identified an

investment contract as a scheme in which a person (1) invests money, (2) in a

common enterprise, and (3) is led to expect profits solely from the efforts of the

promoter or a third party. The three elements of Howey are met here.

First, investors gave Success Trust money and valuable legal rights –

powers of attorney granting Success Trust the legal right to borrow money

secured by the investors' real estate – to invest. (Undisputed Facts ¶ 8.) Second,

investors engaged in a "common enterprise" because they were dependent on

Reynolds' purported expertise in "banking processes."  See SEC v. ETS

Payphones, 408 F.3d 727, 732 (11th Cir. 2005) (holding a common enterprise

may exist by virtue of vertical commonality, where "the investors are dependent

upon the expertise or efforts of the investment promoter for their returns).

Reynolds claimed that the returns offered were possible because of their

relationships with undisclosed banking partners.[1]  (Undisputed Facts ¶ 13).

---

[1]The programs also have the horizontal commonality required by other
circuits. Horizontal commonality requires proof that investors' fortunes "are
tied to the fortunes of the other investors by the pooling of assets."  Revak v.
SEC Realty Corp., 18 F.3d 81, 87-88 (2nd Cir. 1994). Pooling of investor funds
is an essential element of each program offered by Success Trust. (See, e.g.,
Undisputed Facts ¶ 39.)

6

Third, investors expected their profits to come solely from the efforts of others.(Id. ¶¶ 11-13.) Reynolds intentionally did not disclose to investors the manner in which the returns would be achieved. (Id. ¶¶ 13 & 32.)

Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] makes it unlawful for any person to use any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security for which a registration statement is not in effect. Section 5(c) [15 U.S.C. §77e(c)] similarly makes it unlawful to offer for sale a security for which a registration statement has not been filed. From at least May 2005 through at least August 2006, Reynolds has used the mails and other means of interstate commerce, including the Internet and telephones, to offer and sell securities to at least 500 persons throughout the United States. (Undisputed Facts ¶ 43.) No registration statement has been filed with the Commission in connection with these offers and sales. (Id. ¶ 5.) These activities constitute a prima facie violation of Sections 5(a) and 5(c).  See  SEC v. Cont'l Tobacco Co. of S.C., 463 F.2d 137, 155 (5th Cir. 1972). No exemption from the registration requirement of Section 5 is applicable here.

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] prohibits fraud in the offer or sale of a security.  Section 10(b) of the Exchange Act [15 U.S.C. §

7

78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] prohibit fraudulent conduct in connection with the purchase and sale of securities. To prove violations based on misrepresentations or omissions, the Commission must show that the misrepresentations or omissions were material.  SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968).  A misrepresentation or omission is material if there is a substantial likelihood that under all circumstances it would have assumed actual significance in the deliberations of a reasonable investor.  Basic, Inc. v. Levinson, 485 U.S. 224 (1988);  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976).

The undisputed facts establish that Reynolds made materially false representations and omissions in connection with the Programs.  First, Reynolds misrepresented the very existence of the banking processes that Success Trust and its partners purportedly engaged in because those processes did not actually exist. (Undisputed Facts ¶¶ 10, 11, 14.)  Second, Defendants made numerous material misrepresentations designed to deceive investors into believing that the programs were guaranteed or risk-free and that the investors' principal was protected against loss. (Id. ¶¶ 9, 12, 32-34.)  Third, Reynolds and Success Trust's representations that investors in the Best Efforts program could expect returns as high as 480% per year from their investments were materially false.

8

(Id. ¶¶ 9, 14-17, 26-29, 33.)  Finally, Defendants represented to investors that the funds they loaned through the Best Efforts and Private Party Loan Agreement Programs would remain in Success Trust's bank account until the loan transaction was accepted.  (Id. ¶¶ 35, 39, 44-58.)

The Commission also must establish that Defendants acted with scienter to prove violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5.  Aaron v. SEC, 446 U.S. 680 (1980). In the Eleventh Circuit, scienter may be shown by "severe recklessness," defined as "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989).

Defendants offered financial instruments that did not exist, and courts have held promoters of similar "Prime Bank" schemes acted with sufficient recklessness to show scienter.  See SEC v. Asset Recovery and Mgmt Trust, S.A., No. 2:02-CV-1372-WKW, 2008 WL 4831738, at *8 (M.D. Al. Nov. 03, 2008) (discussing relevant case law). Reynolds' actions demonstrate that he was

9

acting with extreme recklessness sufficient to meet the scienter requirement.
See SEC v. Lyttle, 538 F.3d 601, 604 (7th Cir. 2008) (affirming summary
judgment against defendants in "Prime Bank" fraud and holding, based on
circumstantial evidence and adverse inference from the defendants' use of fifth
amendment privilege, that no reasonable jury could doubt defendants acted with
scienter).[2]  Many courts have held that because "Prime Bank" schemes claim to
offer a combination of high returns with no risk, the deal is "inconceivable on
its face" and imposes a heightened duty on the promoter to investigate.  Asset
Recovery, 2008 WL 4831738, at *8 (quoting SEC v. Deyon, 977 F. Supp. 510,
517 (D.Me. 1997)); SEC v. Milan Capital, No. 00cv108, 2000 WL 1682761, at
*5 (S.D.N.Y Nov. 9, 2000). Furthermore, because Reynolds controlled Success
Trust, his scienter is imputed to it.  SEC v. Manor Nursing Ctrs., Inc., 458 F.2d
1082, 1097 n.18 (2d Cir. 1972).

Reynolds acted with the extreme recklessness necessary to establish
scienter.  Reynolds made statements that the investment principal was
guaranteed against any loss.  (Undisputed Facts ¶¶ 9, 23-25, 33 & 38.)
Additionally, Reynolds promised his investors exorbitant returns, which were

---

[2] Even if Reynolds could argue that he genuinely believed the claims he made
to the investing public, scienter can be inferred because Reynolds did not conduct
adequate diligence.  Asset Recovery, 2008 WL 4831738, at *8.

patently false.  (Undisputed Facts ¶¶ 9, 15-17, 19-22, 33 & 38.)  The Court can

infer scienter from these statements as well as from Reynolds' numerous

statements that Success Trust's programs had received regulatory approval.

(Undisputed Facts ¶ 40.)

Finally, Reynolds' use of investor funds for personal expenses

demonstrates a high level of scienter.  Rather than investing in no-risk, high

return investments, Reynolds spent at least $834,717 of investor funds on

personal expenses. (Undisputed Facts ¶¶ 49, 50, 54.)  Reynolds never disclosed

to investors that funds from the Programs would be used to pay his personal

expenses.

Thus, Defendants' extremely reckless statements about the Programs,

including their rates of return, levels of risk, and regulatory approval status

demonstrate a high level of scienter. A finding of scienter is further supported

by the fact that Reynolds used investor funds for personal expenses.

Based upon the established violations of the securities laws by

Defendants, the Court finds that the Commission is entitled to the relief it seeks.

The Commission "is entitled to injunctive relief when it establishes (1) a *prima*

*facie* case of previous violations of federal securities laws and (2) a reasonable

likelihood that the wrong will be repeated." <u>SEC v. Calvo</u>, 378 F.3d 1211,

1216 (11th Cir. 2004).  Having found violations of the federal securities laws,
the Court considers the following factors to determine if there is a reasonable
likelihood that the wrong will be repeated: "egregiousness of the Defendant's
actions, the isolated or recurrent nature of the infractions, the degree of scienter
involved, the sincerity of the Defendant's assurances against future violations,
the Defendant's recognitions of the wrongful nature of the conduct, and the
likelihood that the Defendant's occupation will present opportunities for future
violations." Id.   The Court concludes that all of these factors are present.

Reynolds lulled investors into contributing at least $5,225,891.92 into the
Programs (Undisputed Facts ¶ 43), for which few investors received any
returns. (Id. ¶ 29.) Given that the Receiver was only able to recover
$1,661,528.10 from the Success Trust bank accounts, (see Receiver's
Preliminary Report at 4 (Dkt. No. 14)), and that Reynolds spent at least
$834,717 of investor funds on personal expenses, (Undisputed Facts ¶¶ 49), a
permanent injunction is appropriate.

Second, Reynolds' violations were recurrent, as the conduct continued
for approximately fourteen months. (Id. ¶ 6.) Third, the types of
misrepresentations made and the fact that Reynolds spent at least $834,717 of
investor funds on personal expenses establishes a high degree of scienter. With

regard to the fourth and fifth factors, Reynolds has never acknowledged the wrongfulness of his conduct and has made no assurances against future violations.

Finally, Reynolds is likely to violate the federal securities laws in the future in the absence of a permanent injunction. While the order placing Success Trust under the control of a Receiver has forced Reynolds to stop using that particular entity in furtherance of any fraudulent schemes, in the absence of a permanent injunction, Reynolds could form another business organization for this purpose. Reynolds has the motive to violate federal securities laws in the future: Reynolds has not been able to earn enough money through lawful work to meet his family's needs during the pendency of this lawsuit. (See Resp. to Pl's Application to Hold Def. Reynolds in Civil Contempt at 5-7 (Dkt. No. 29).) If the preliminary injunction currently in force against him were to be lifted without a permanent injunction, he would thus have a strong motive to fall back on his previous endeavor, securities fraud, in order to support his family.

Moreover, Reynolds has the skills needed to woo large numbers of people into a fraudulent scheme, as evidenced by his recruitment of hundreds of victims into Success Trust's Programs. It is likely that Reynolds still has access to the names and contact information of Success Trust investors, and could use

his relationships with at least some of them as a springboard for another

fraudulent scheme. Because Reynolds has both the motive and opportunity to

engage in securities fraud, a permanent injunction is necessary to protect the

public from future harm at his hands.

Disgorgement is designed both to deprive a wrongdoer of his unjust

enrichment and to deter others from violating the securities laws.  SEC v. Blatt,

583 F.2d 1325, 1335 (5th Cir. 1978);  SEC v. First City Fin. Corp. [hereinafter

"First City 2"], 890 F.2d 1215 (D.C. Cir. 1989); Manor Nursing, 458 F.2d at

1104 ("The effective enforcement of the federal securities laws requires that the

SEC be able to make violations unprofitable."). Where, as here, the fraud is

"pervasive," the Court should order all profits stemming from the scheme to be

disgorged. CFTC v. British Am. Commodity Options Corp., 788 F.2d 92, 93-94

(2d Cir.1986).

The law does not require precision in determining the proper amount of

disgorgement. "The District Court has broad discretion not only in determining

whether or not to order disgorgement but also in calculating the amount to be

disgorged."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996).

The Commission "is entitled to disgorgement upon producing a reasonable

approximation of a defendant's ill-gotten gains." Calvo, 378 F.3d at 1217. In

determining the appropriate disgorgement amount, all doubts "are to be resolved against the defrauding party." <u>SEC v. First City Fin. Corp.</u>, 688 F. Supp. 705, 727 (D.D.C. 1988) (quoting <u>SEC v. McDonald</u>, 699 F2d 47, 55 (1st Cir. 1983)). "Once the [Commission] has established that the disgorgement figure is a reasonable approximation of unlawful profits, the burden of proof shifts to the defendants, who must 'demonstrate that the disgorgement figure is not a reasonable approximation.'" <u>SEC v. Hughes Capital Corp.</u>, 917 F. Supp. 1080, 1085 (D.N.J. 1996) (quoting <u>First City 2</u>). Because of Reynolds' rampant use of investor funds for personal expenses, the Court concludes that Reynolds should be required to disgorge $834,717.

Where a securities law violator has enjoyed access to funds over a period of time as a result of his wrongdoing, requiring the violator to pay prejudgment interest is consistent with the equitable purpose of disgorgement. <u>Id.</u> at 1090. Therefore, the Court **ORDERS** that Reynolds pay prejudgment interest on the amount of the disgorgement.  The Court accepts the calculations submitted in the Commission's brief (Pl.'s Br. (Dkt. No. 74) at 22) and **ORDERS** Defendant to pay $36,907.39 in prejudgment interest.

The Commission also seeks civil money penalties against Reynolds pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77(t)(d)] and

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78(u)(d)(3)]. The decision to impose a penalty, and the amount of any such penalty, is a matter within the discretion of the Court. "First tier" penalties for violations by a person occurring after February 14, 2005, but on or before March 3, 2009, may be imposed up to the greater of $6,500[3] or the amount of pecuniary gain to the defendant as a result of the violation. See 17 C.F.R. § 201.1003. When the violation involves fraud, "second tier penalties" for violations by a person may be imposed up to the greater of $65,000 or the amount of pecuniary gain to the defendant as a result of the violation. A "third tier" civil penalty for violations by a person of up to the greater of **$130,000** or the amount of pecuniary gain to the defendant as a result of the violation may be imposed when any provision of the Securities Act or the Exchange Act is violated, if the violation involved fraud or deceit and the violation resulted in substantial losses or created a significant risk of substantial losses to other persons.  Id.

Defendants' violations involved fraud and deceit and resulted in substantial losses to investors. The requirements for all three tiers of penalties are met in this case.  At least $5,225,891.92 were contributed by investors and

---

[3] Tiered penalties must be adjusted for inflation.  17 C.F.R. § 201.1003, Adjustment of civil monetary penalties – 2005. 70 FR 7607.  The penalty amounts identified herein have been adjusted for inflation.

the Receiver was only able to recover $1,661,528.10 from Success Trust Bank

Accounts.  It is appropriate that the civil penalty have some relationship to the

ill-gotten gains.  <u>SEC v. One Wall Street, Inc.</u>, No. 06-cv-4217(NGG) (ARL),

2008 WL 5082294, at *9 (E.D.N.Y. Nov. 26, 2008) awarding third tier civil

penalties against corporate defendant of $1,925.620, or total pecuniary gain.)

Civil penalties are assessed against Reynolds in the amount of $2,000,000 and

against Success Trust in the amount of $2,000,000.

### Conclusion

Based on the foregoing, Plaintiff's Motion for Summary Judgment [74] is

hereby **GRANTED**.  Judgment shall be entered in favor of Plaintiff and against

Defendants Reynolds and Success Trust granting a permanent injunction

against Defendants from future violations of the securities laws, ordering

disgorgement in the amount of $834,717.88 plus prejudgment interest of

$36,907.39, and imposing civil penalties of $2,000,000 and $2,000,000 against

Success Trust.

**SO ORDERED**, this   5th   day of October , 2010.

**RICHARD W. STORY**
United States District Judge

17